IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:20-cr-178 (TSE) |
| CAPRICE FOSTER, | |
| a.k.a.  Caprice Ladawn Foster, Caprice Amole-Whitley, Caprice Amole, Caprice Ladawn Whitley, | <u>Count 1</u>: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud) |
| and | <u>Counts 2 - 3</u>: 18 U.S.C. §§ 1344 & 2 (Bank Fraud) |
| MARCUS AARON FOSTER, | <u>Counts 4 - 7</u>: 18 U.S.C. §§ 1343 & 2 (Wire Fraud) |
| Defendants. | <u>Count 8</u>: 18 U.S.C. §§ 1029(a)(2) & 2 (Access Device Fraud) |
| | <u>Counts 9 - 11</u>: 18 U.S.C. §§ 1028A & 2 (Aggravated Identity Theft) |
| | Forfeiture Notice |

## <u>SUPERSEDING INDICTMENT</u>

April 2021 Term – at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

## <u>INTRODUCTORY ALLEGATIONS</u>

At all times relevant to this Superseding Indictment, unless otherwise stated:

1.     Defendants CAPRICE FOSTER ("CAPRICE") and MARCUS AARON FOSTER

("MARCUS") resided within the Eastern District of Virginia.

2.      From on or about August 8, 2017, to on or about August 5, 2019, CAPRICE was employed by Company A, a company that operated a timeshare program.   CAPRICE worked in Company A's office in Washington, D.C.

3.      From in or around 2015 through in or around 2017, CAPRICE worked as a real estate agent.

4.      In or around January 2017, MARCUS incorporated Company B as a real estate consulting and transactions company with an address in Germantown, Maryland.   CAPRICE and MARCUS used Company B in furtherance of the conspiracy and fraud scheme described in the criminal counts.

5.      Chime offered online financial services through its partner banks, The Bancorp Bank, and Stride Bank, N.A. ("Stride Bank").   On behalf of its users, Chime managed deposit accounts and other accounts held at The Bancorp Bank and Stride Bank ("Chime accounts"). The Bancorp Bank and Stride Bank are both members of the Federal Deposit Insurance Corporation ("FDIC"), and deposits made through Chime were insured by the FDIC through The Bancorp Bank and Stride Bank.   As such, Chime, The Bancorp Bank, and Stride Bank were financial institutions within the meaning of 18 U.S.C. § 20.

6.      JP Morgan Chase Bank, N.A. ("JP Morgan Chase") was a banking institution, the deposits of which were insured by the FDIC.   As such, JP Morgan Chase was a financial institution within the meaning of 18 U.S.C. § 20.

7.      SunTrust Bank, N.A. ("SunTrust") was a banking institution, the deposits of which were insured by the FDIC.   As such, SunTrust was a financial institution within the meaning of 18 U.S.C. § 20.

8.      Citibank, N.A. ("Citibank") was a banking institution, the deposits of which were insured by the FDIC.   As such, Citibank was a financial institution within the meaning of 18 U.S.C. § 20.

9.      Alliant Credit Union ("Alliant") was a credit union with accounts insured by the National Credit Union Share Insurance Fund.   As such, Alliant was a financial institution within the meaning of 18 U.S.C. § 20.

10.      Ally Bank was a banking institution, the deposits of which were insured by the FDIC.   As such, Ally Bank was a financial institution within the meaning of 18 U.S.C. § 20.

11.      Wells Fargo Bank, N.A. ("Wells Fargo") was a banking institution, the deposits of which were insured by the FDIC.   As such, Wells Fargo was a financial institution within the meaning of 18 U.S.C. § 20.

12.      First National Bank of Pennsylvania ("First National Bank") was a banking institution, the deposits of which were insured by the FDIC.   As such, First National Bank was a financial institution within the meaning of 18 U.S.C. § 20.

13.      Apple Federal Credit Union was a credit union with accounts insured by the National Credit Union Share Insurance Fund.   As such, Apple Federal Credit Union was a financial institution within the meaning of 18 U.S.C. § 20.

14.      Axos Bank was a banking institution, the deposits of which were insured by the FDIC.   As such, Axos Bank was a financial institution within the meaning of 18 U.S.C. § 20.

15.      USAA Federal Savings Bank ("USAA") was a banking institution, the deposits of which were insured by the FDIC.   As such, USAA was a financial institution within the meaning of 18 U.S.C. § 20.

3

16.     Navy Federal Credit Union was a credit union with accounts insured by the National Credit Union Share Insurance Fund.   As such, Navy Federal Credit Union was a financial institution within the meaning of 18 U.S.C. § 20.

17.     Educational Systems Federal Credit Union was a credit union with accounts insured by the National Credit Union Share Insurance Fund.   As such, Educational Systems Federal Credit Union was a financial institution within the meaning of 18 U.S.C. § 20.

18.     All the victims alleged in this Superseding Indictment are real people, who did not authorize CAPRICE and MARCUS to use their personal identifying information to obtain, and attempt to obtain, money and property.

4

## COUNT 1

(Conspiracy to Commit Wire Fraud and Bank Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

19.     The allegations contained in paragraphs 1 through 18 of this Superseding Indictment are realleged and incorporated as if fully set forth herein.

### The Conspiracy and Its Objects

20.     From in or around 2018 through in or around July 2020, in the Eastern District of Virginia and elsewhere,

**CAPRICE FOSTER,**

**MARCUS AARON FOSTER,**

and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree with each other to commit offenses against the United States, namely:

a.      wire fraud, that is, CAPRICE, MARCUS, and others known and unknown to the Grand Jury, knowingly and intentionally devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

b.      bank fraud, that is, CAPRICE, MARCUS, and others known and unknown to the Grand Jury, knowingly and intentionally conspired with each other to execute a scheme and artifice to defraud one or more financial institutions,

5

including but not limited to Chime, The Bancorp Bank, Stride Bank, JP Morgan
Chase, SunTrust, Citibank, Alliant, Ally Bank, Wells Fargo, First National Bank,
Apple Federal Credit Union, Axos Bank, USAA, Navy Federal Credit Union, and
Educational Systems Federal Credit Union to obtain moneys, funds, credit, and
other property under the custody and control of those financial institutions by
means of materially false and fraudulent pretenses, representations, and promises,
in violation of Title 18, United States Code, Section 1344.

### Purpose of the Conspiracy

21.     It was a purpose of the conspiracy for CAPRICE and MARCUS to obtain
moneys, funds, credit, leases, and other property by means of materially false and fraudulent
pretenses, representations, and promises.

### Manner and Means

In furtherance of the scheme to defraud, and to accomplish its unlawful object, the
following manner and means were used, among others:

22.     CAPRICE and MARCUS obtained personal identifying information, such as
Social Security numbers, dates of birth, driver's license numbers, and passport numbers of real
people in various ways, including by stealing mail and by using Company A's customers'
personal identifiers and identification documents, which CAPRICE obtained through her
employment with Company A.   CAPRICE and MARCUS used the personal identifying
information belonging to these individuals without these individuals' knowledge or
authorization.

23.     CAPRICE and MARCUS opened accounts at federally insured financial
institutions in the names of real people who did not know about or authorize such account

6

openings.   In order to open and use accounts in names of other people, CAPRICE and

MARCUS used the real identifiers of the named applicants including their names, dates of birth,

Social Security numbers, and driver's license numbers.   CAPRICE and MARCUS fabricated

identification documents including fraudulent driver's licenses, social security cards, and

passports in order to falsely verify their identity as the named applicants.

24.     Fraudulent accounts opened by CAPRICE and MARCUS were often funded

through other fraudulent activity, including by initiating funds transfers from other fraudulent

accounts and lines of credit, and by depositing stolen credit card convenience checks, stolen

personal checks, altered cashier's checks, and personal checks ordered through other fraudulent

accounts established by CAPRICE and MARCUS.

25.     CAPRICE and MARCUS often used the addresses of vacant properties as the

mailing addresses for the fraudulent accounts and retrieved mail connected to the fraudulent

accounts from the vacant properties' mailboxes.   Such mail included check books, debit cards,

and credit cards associated with the fraudulent accounts.

26.     CAPRICE and MARCUS also applied for and obtained loans and opened credit

card accounts and lines of credits using real people's personal identifiers such as names, dates of

birth, and Social Security numbers.   In support of these loan and credit applications, CAPRICE

and MARCUS sometimes submitted fictitious earnings statements and other fake documents

they had created purporting to verify their identity as the named applicant.   At times, CAPRICE

and MARCUS listed Company B as an employer in their fabricated documents, allowing

CAPRICE and MARCUS to falsely verify employment and income information in an attempt to

obtain approval of their loan and credit applications.

27.     CAPRICE and MARCUS used fraudulently obtained loans, personal lines of credit, and credit cards to make purchases, including to purchase a Land Rover Range Rover sport utility vehicle, and to obtain funds for their personal use.

28.     CAPRICE and MARCUS typically overdrew the fraudulent accounts and defaulted on the debts incurred on the fraudulently obtained credit cards, loans, and personal lines of credit.

29.     CAPRICE and MARCUS also obtained leases using real people's personal identifiers such as names, dates of birth, and Social Security numbers.   In support of these lease applications, CAPRICE and MARCUS sometimes submitted fictitious earnings statements and other fake documents they had created in order to secure the leases.   CAPRICE and MARCUS often wrote checks or initiated electronic payments from the fraudulent accounts they had opened in order to secure the leases and obtain and prolong their access to the properties.

30.     After fraudulently obtaining leases and moving into the leased properties, CAPRICE and MARCUS failed to pay rent, sometimes incurring tens of thousands of dollars in unpaid rent before leaving or being evicted.

31.     CAPRICE and MARCUS created email addresses in the names of the individuals whose identities they stole and used those email addresses in furtherance of their scheme to defraud.   Among other things, they used the email addresses to open fraudulent accounts online and to fraudulently apply for loans and lines of credit.   They also used the email addresses to communicate directly with fraud victims while falsely representing themselves to be the individuals whose identities they stole.

8

32.     CAPRICE and MARCUS also used several Voice over Internet Protocol phone numbers to communicate with financial institutions, landlords, and realtors in furtherance of their fraudulent scheme, often while purporting to be individuals whose identities they stole.

<u>Acts in Furtherance of the Conspiracy</u>

33.     CAPRICE and MARCUS committed overt acts in furtherance of the conspiracy in the Eastern District of Virginia and elsewhere, including the following:

<u>Acts Involving G.M., Chime,</u><br><u>The Bancorp Bank, Stride Bank, and USAA</u>

34.     In or around June 2018, CAPRICE obtained personal identifying information for G.M. through CAPRICE's employment with Company A.

35.     In or around August 2018, CAPRICE and MARCUS obtained a lease in McLean, Virginia, within the Eastern District of Virginia, using the personal identifying information of G.M., without G.M.'s knowledge or authorization.   In the lease application materials, CAPRICE and MARCUS falsely stated that G.M. was employed by Company B and supervised by MARCUS.   CAPRICE and MARCUS also submitted fraudulent documentation as proof of income in order to secure the lease.   CAPRICE and MARCUS accrued thousands of dollars in unpaid rent while living in the property they leased using G.M.'s identity.

36.     On or about August 27, 2018, a Chime account ending in 2856 was opened using G.M.'s personal identifying information, including G.M.'s name, date of birth, and Social Security number.   From in or around January 2019 through in or around June 2019, the mailing address for the Chime account was the address of the rental property in McLean, Virginia, that CAPRICE and MARCUS were leasing using G.M.'s personal identifying information.

9

37.     The Chime account ending in 2856 was initially funded with transfers from a Visa card in CAPRICE's name.   On or about May 1, 2019, $99 was transferred from a Visa card in the name of CAPRICE to the Chime account ending in 2856.

38.     G.M. did not open or use, or authorize anyone else to open or use, a Chime bank account using G.M.'s personal identifying information.

39.     On or about July 8, 2018, a credit card application was submitted to USAA in G.M.'s name, using G.M.'s personal identifying information and a mailing address in Vienna, Virginia.   Based on this application, USAA issued a Visa credit card ending in 3243.   Between on or about July 20, 2018, and on or about August 3, 2018, CAPRICE and MARCUS spent more than $9,000 on this card.   CAPRICE and MARCUS did not repay this debt.

40.     G.M. did not apply for or use, or authorize anyone else to apply for or use, a USAA credit card using G.M.'s personal identifying information.   G.M. has never resided in the Commonwealth of Virginia and did not use addresses in Virginia to receive mail.

### Acts Involving W.G., JP Morgan Chase, Wells Fargo, and Lease at Preserve Crest Way

41.     In or around October 2015, W.G. and L.C. purchased a home, and CAPRICE served as their real estate agent for the purchase.   As their realtor, CAPRICE had access to the W.G. and L.C.'s personal identifying information.

42.     On or about May 21, 2019, a checking account ending in 2916 was opened at JP Morgan Chase in the name of W.G., using his personal identifying information, including his social security number, date of birth, and driver's license number.   The JP Morgan Chase account ending in 2856 listed a mailing address in Great Falls, Virginia.

43.     On or about May 25, 2019, $250 was transferred from the JP Morgan Chase account in W.G.'s name ending in 2916 to the Chime account in G.M.'s name ending in 2856

10

through Zelle, a service offered to customers of certain banks to send and receive money.   On or about May 26, 2019, an additional $300 was transferred from the JP Morgan Chase account ending in 2916 to the Chime account ending in 2856 through Zelle.

44.     On or about August 16, 2019, an account application was submitted to Wells Fargo using W.G.'s personal identifying information, including W.G.'s name, driver's license number, and social security number.   Following that application, a Wells Fargo checking account ending in 2457 was opened in W.G.'s name.   The mailing address listed for the account was located in Great Falls, Virginia.

45.     W.G. did not open or use, or authorize anyone else to open or use, the JP Morgan Chase account ending in 2916 or the Wells Fargo account ending in 2457 using W.G.'s personal identifying information. W.G. has not resided in the Commonwealth of Virginia since the 1980s.

46.     On or about May 19, 2019, an application for a lease of a residential property located on Preserve Crest Way in McLean, Virginia, within the Eastern District of Virginia, was submitted in W.G.'s name, using W.G.'s personal identifying information without his knowledge or authorization.   The application contained false statements about employment and income, and fictitious earnings statements were submitted in support of the application.   CAPRICE and MARCUS also sent, or caused to be sent, a fictitious email purporting to verify the fraudulent employment and income information submitted.

47.     On or about May 22, 2019, CAPRICE and MARCUS provided a check to the landlord of the Preserve Crest Way property from a fraudulent account that had been opened at First National Bank using the personal identifying information of another individual, L.G., without L.G.'s knowledge or authorization.

11

48.   On or about August 22, 2019, MARCUS appeared at an eviction proceeding in Fairfax County General District Court, falsely representing himself to the court as W.G.

### Acts Involving R.D., H.C.P., SunTrust, Citibank, Apple Federal Credit Union, and Axos Bank

49.   In or around April 2019, R.D. (also known as R.R.) and L.D. traveled to Washington, D.C. to stay at a Company A property and consider purchasing a timeshare. CAPRICE was the point of contact for R.D. and L.D.'s timeshare application.   During the application process, CAPRICE made copies of R.D. and L.D.'s Social Security cards, drivers' licenses, and L.D.'s military identification.

50.   On or about August 20, 2019, an account at SunTrust bank ending in 2111 was opened in R.D.'s name using R.D.'s personal identifying information without her knowledge or authorization.

51.   On or about August 21, 2019, MARCUS deposited a "convenience check" from a Citibank credit card account ending in 8604 in the name of H.C.P. into the SunTrust account ending in 2111.   The convenience check was made payable to R.R. in the amount of $4,580.00 and was deposited at a SunTrust branch location in Great Falls, Virginia.

52.   H.C.P. did not use, and did not authorize anyone else to use, the convenience check associated with his Citibank credit card.   H.C.P. does not know MARCUS or R.D.

53.   On or about August 26, 2019, an account ending in 0266 was opened at Apple Federal Credit Union in R.D.'s name using R.D.'s personal identifying information without her knowledge or authorization.

54.   On or about August 28, 2019, an application for a $10,000 loan from Apple Federal Credit Union was submitted using R.D.'s personal identifying information without her

knowledge or authorization.   A copy of R.D.'s driver's license was submitted in support of the application.

   55.    On or about September 9, 2019, an application for a $27,000 loan was submitted to Axos Bank using R.D.'s personal identifying information without R.D.'s knowledge or authorization.   In addition to providing R.D.'s date of birth and social security number in the application, a copy of R.D.'s driver's license was submitted in support of the application from an email address that R.D. did not know about or use.

   56.    R.D. did not open or use, or authorize anyone else to open or use, a SunTrust bank account or an Apple Federal Credit Union account, using R.D.'s personal identifying information.   Nor did R.D. apply for, or authorize anyone else to use her personal identifying information to apply for, loans from Apple Federal Credit Union or Axos Bank.

   57.    In or around July 2020, real and fabricated identification documents bearing R.D.'s personal identifying information were recovered from a residence in Dunn Loring, Virginia, where CAPRICE and MARCUS were living.   One of the fabricated driver's licenses contained R.D.'s name and driver's license number but the image on the license was a photo of CAPRICE.   Paperwork and checkbooks in R.D.'s name from several financial institutions (including SunTrust, Apple Federal Credit Union, and Axos Bank) were also located in the Dunn Loring residence.

<u>Acts Involving L.G., First National Bank,</u>
<u>USAA, and Navy Federal Credit Union</u>

   58.    In or around November 2018, CAPRICE obtained personal identifying information for L.G. through CAPRICE's employment with Company A.

13

59.     On or about January 20, 2019, an account at First National Bank ending in 0584 was opened in in L.G.'s name using L.G.'s personal identifying information without L.G.'s knowledge or authorization.

60.     On or about January 25, 2019, CAPRICE and MARCUS caused a $1,850 check from an account at First National Bank ending in 0584 in the name of L.G. to be deposited into a USAA account ending in 4482 in CAPRICE's name.

61.     On or about January 30, 2019, a credit card account at Navy Federal Credit Union ending in 9861 was opened in L.G.'s name using L.G.'s personal identifying information without L.G.'s knowledge or authorization.

62.     On or about April 5, 2019, a $5,600 check from a First National Bank account ending in 0584 in the name of L.G. was used to make a payment toward a Navy Federal Credit Union credit account ending in 9861 in the name of L.G.

<u>Acts Involving N.N., Ally Bank, JP Morgan Chase, and SunTrust</u>

63.     In or around August 2018, CAPRICE obtained N.N.'s personal identifying information through CAPRICE's employment with Company A.

64.     On or about July 19, 2019, an online application to open new accounts was submitted to Ally Bank using N.N.'s personal identifying information without N.N.'s knowledge or authorization.   The application was approved, and Ally Bank accounts ending in 6262 and 6277 were opened in N.N.'s name.

65.     On or about July 29, 2019, an altered cashier's check from JP Morgan Chase made payable to N.N. for $25,000 was deposited into the Ally Bank account ending in 6262. The original JP Morgan Chase cashier's check had been written for five dollars.

14

66.     On or about August 15, 2019, a Schwab One Brokerage Account ending in 0358 was opened using N.N.'s personal identifying information without N.N.'s knowledge or authorization.

67.     On or about August 15, 2019, a check made out to N.N. in the amount of $42,500 was deposited into a Schwab One Brokerage Account ending in 0358 in N.N.'s name.   The check was drawn on a SunTrust Equity Line Account ending in 9627 belonging to R.R.R. and D.L.R.

68.     R.R.R. and D.L.R. did not use, and did not authorize anyone else to use, any checks associated with their SunTrust account ending in 9627.

69.     On or about October 22, 2019, officers from the Fairfax County Police Department ("FCPD") responded to a residence in Vienna, Virginia for a reported unlawful entry at a home that was listed for sale.   FCPD officers determined that two individuals who had moved into the home and falsely identified themselves as N.N. and E.G., were CAPRICE and MARCUS respectively.

### Acts Involving E.G., Alliant, and Lease on Harithy Drive

70.     In or around the summer of 2019, CAPRICE and MARCUS obtained E.G.'s personal identifying information when E.G. sought help from CAPRICE and MARCUS to obtain a line of credit for E.G.'s business.

71.     On or about October 1, 2019, an account ending in 9793 was opened at Alliant using E.G.'s personal identifying information without his knowledge or authorization.   Copies of a social security card and driver's license bearing E.G.'s personal identifying information were submitted as proof of identification in order to open the account.

15

72.     On or about October 11, 2019, a check made out to E.G. in the amount of $6,300 was deposited into the Alliant checking account for the member account ending in 9793 in E.G.'s name.   The check was drawn on a JP Morgan Chase credit card account belonging to J.H.

73.     On or about October 17, 2019, MARCUS called Alliant, and falsely identified himself as E.G.   The caller, referring to the $6,300 check from J.H.'s credit card account, stated that he deposited the check himself and inquired whether he could do anything to expedite the clearance of the check funds.

74.     J.H. did not use, and did not authorize anyone else to use, checks associated with his JP Morgan Chase credit card.

75.     In or around December 2019, CAPRICE and MARCUS used E.G.'s personal identifying information to obtain a lease from J.T. for a residential property on Harithy Drive in Dunn Loring, Virginia, within the Eastern District of Virginia.   E.G. did not know about or authorize CAPRICE and MARCUS to use his personal identifying information for this purpose.

76.     From in or around December 2019 through in or around July 2020, CAPRICE and MARCUS occupied the Harithy Drive property without paying rent.

<u>Acts Involving J.T., SunTrust, and JP Morgan Chase</u>

77.     In or around early 2020, while CAPRICE and MARCUS were living at the Harithy Drive residence owned by J.T. and failing to pay rent to J.T., CAPRICE and MARCUS obtained J.T.'s personal identifying information and used it without J.T.'s knowledge or authorization to open financial accounts and attempt to secure new housing.

16

78.     On or about April 15, 2020, accounts at SunTrust Bank ending in 7121 and 7154 were opened in J.T.'s name using J.T.'s personal identifying information without his knowledge or authorization.

79.     In or around March 2020, CAPRICE and MARCUS began inquiring about home rentals using J.T.'s identity.   MARCUS impersonated J.T. in person, in phone calls, and in emails.

80.     In or around March 2020, realtor K.T. was contacted by someone claiming to be J.T. who was inquiring about a property listing for a home in Falls Church, Virginia.

81.     On or about May 16, 2020, a rental application was submitted for a residential property on Calla Drive in McLean, Virginia, using J.T.'s personal identifying information without his knowledge or authorization.

82.     On or about May 25, 2020, CAPRICE and MARCUS caused a check from the SunTrust account ending in 7121 in J.T.'s name in the amount of $10,000 to be provided to the listing agent for the Calla Drive property in order to secure the lease for the property.   The check was made out to TTR Sotheby and failed to clear.

83.     Between on or about May 22, 2020 and on or about June 15, 2020, CAPRICE and MARCUS provided a series of fictitious explanations for the delay in providing funds to secure the lease, including emailing a fabricated screen shot to K.T. of the SunTrust account ending in 7121, purporting to show that a transfer of $10,000 to United Bank had been initiated to secure the Calla Drive property and that the money had been withdrawn from J.T.'s SunTrust account.

84.     After the SunTrust check failed to clear and the supposed transfer to United Bank was unsuccessful, MARCUS, purporting to be J.T., met with realtor K.T. in person on or about June 12, 2020, and provided a check drawn on a JP Morgan Chase account ending in 5972 in the

name of another individual, D.D.T., falsely claiming that D.D.T. was J.T.'s sister.   The check was made out to P.M. in the amount of $10,000 and had the Calla Drive property address in the memo line.

Acts involving D.D.T., JP Morgan Chase, and a
Loan for a Land Rover Range Rover Vehicle

85.      On a date unknown, but not later than February 2020, CAPRICE and MARCUS obtained the personal identifying information for D.D.T.

86.      On or about February 6, 2020, an online application was submitted for a JP Morgan Chase checking account using D.D.T.'s personal identifying information without her knowledge or authorization. As a result of this application, a JP Morgan Chase checking account ending in 5972 was opened in D.D.T.'s name.

87.      On or about March 5, 2020, an application for a loan to purchase a 2018 Land Rover Range Rover sport utility vehicle was submitted using D.D.T.'s personal identifying information without her knowledge or authorization.   A loan in the amount of $63,786 was issued by JP Morgan Chase in D.D.T.'s name to purchase a Range Rover with a vehicle identification number (VIN) ending in 3889.   On or about July 8, 2020, the Land Rover Range Rover vehicle with the same VIN was located in the garage of the Harithy Drive property where CAPRICE and MARCUS were living under a lease they obtained from J.T. using E.G.'s identity.   Paperwork related to the purchase and registration of the Range Rover in D.D.T.'s name was also located in the Harithy Drive residence.

88.      On or about February 18, 2020, an application for a JP Morgan Chase credit card was made using D.D.T.'s personal identifying information without her knowledge or authorization.   The application was approved, and a JP Morgan Chase Sapphire credit card

18

ending in 0947 was opened in D.D.T.'s name.   MARCUS and CAPRICE accrued over $19,000 in unpaid debt on this card.

89.     On or about July 8, 2020, a statement for the JP Morgan Chase Sapphire card ending in 0947 was recovered from the Harithy Drive residence where CAPRICE and MARCUS were living.

90.     Fabricated identification documents bearing D.D.T.'s personal identifying information, paperwork and checkbooks in D.D.T.'s name from several financial institutions (including JP Morgan Chase), and fraudulent checks and earning statements bearing D.D.T.'s name were also found in the Harithy Drive residence where CAPRICE and MARCUS were living.

<u>Acts Involving D.C.T. and Educational Systems Federal Credit Union</u>

91.     On a date unknown, but not later than December 2019, CAPRICE and MARCUS obtained the personal identifying information for D.C.T.

92.     On or about January 14, 2020, a new member application was submitted to Educational Systems Federal Credit Union using D.C.T.'s personal identifying information without his knowledge or authorization.   A fabricated passport for D.C.T. was submitted with the application.   On or about January 15, 2020, an Educational Systems Federal Credit Union member account ending in 3719 was opened in D.C.T.'s name.

93.     On or about January 11, 2020, an application was submitted to Educational Systems Federal Credit Union for a $16,000 loan using D.C.T.'s personal identifying information without his knowledge or authorization.   The loan application was approved in the amount of $10,000 and funds were disbursed on or about January 15, 2020.

94.     On or about July 8, 2020, fabricated identification documents bearing D.C.T.'s personal identifying information, paperwork in D.C.T.'s name from financial institutions (including Educational Systems Federal Credit Union), and fraudulent checks and earnings statements in D.C.T.'s name were recovered from the Harithy Drive residence where CAPRICE and MARCUS were living.

<u>Additional Overt Acts</u>

95.     Between no later than in or around 2018, and in or around July 2020, CAPRICE and MARCUS applied for additional fraudulent financial accounts, loans, credit, and leases in furtherance of the charged conspiracy.   CAPRICE and MARCUS attempted to, and did, transfer, withdraw, deposit, and spend funds from the fraudulent accounts, loans, and credit they obtained using the personal identifying information of other real people without their authorization.   Likewise, CAPRICE and MARCUS attempted to, and did, qualify for residential leases using the personal identifying information of other real people without their knowledge or authorization.

(In violation of Title 18, United States Code, Section 1349).

**COUNTS 2 - 3**
(Bank Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

96.     Paragraphs 1 through 18 of this Superseding Indictment are hereby re-alleged and incorporated as if set forth fully herein.

97.     From in or around 2018, and continuing through in or around June 2020, in the Eastern District of Virginia and elsewhere, the defendants, CAPRICE FOSTER and MARCUS AARON FOSTER, did knowingly devise and intend to devise a scheme and artifice to defraud financial institutions, and to obtain moneys and funds under the custody and control of those financial institutions by means of materially false and fraudulent pretenses and representations.

98.     On or about the dates identified below, in the Eastern District of Virginia, the defendants did knowingly and unlawfully execute and attempt to execute the aforesaid scheme and artifice to defraud the financial institutions identified below and to obtain money and funds under the control of those financial institutions by means of materially false and fraudulent pretenses and representations.

| Count | Date | Affected Accounts | Amount |
|-------|------|-------------------|--------|
| 2 | September 30, 2019 | Apple Federal Credit Union account ending in 0266; Wells Fargo account ending in 2457 | $5,000 |
| 3 | May 25, 2020 | SunTrust Account ending in 7121 | $10,000 |

(In violation of Title 18, United States Code, Section 1344 and 2).

21

## COUNTS 4 - 7
(Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

99.     Paragraphs 1 through 18 of this Superseding Indictment are hereby re-alleged and incorporated as if set forth fully herein.

100.    On or about the dates identified below, for the purpose of executing the scheme and artifice to defraud described in Count 1, and for the purpose of obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, the defendants, CAPRICE FOSTER and MARCUS AARON FOSTER, knowingly transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce a writing, sign, signal, picture, and sound that either originated or terminated within the Eastern District of Virginia.

| Count | Approx. Date | Description of Wire Communication |
|-------|-------------|-----------------------------------|
| 4 | July 7, 2018 | Electronic transmission of credit card application in G.M.'s name to USAA |
| 5 | August 22, 2018 | Electronic transmission of lease application for "The Kingston" in G.M.'s name |
| 6 | August 21, 2019 | Deposit of check in the amount $4,580 into SunTrust account ending in 2111 |
| 7 | September 10, 2019 | Email sent to Axos Bank with subject line "Proof of Income R.D. Loan Application" |

(In violation of Title 18, United States Code, Sections 1343 and 2).

## COUNT 8

### (Access Device Fraud)

101.    From at least in or around 2018 to in or around July 2020, in the Eastern District of Virginia and elsewhere, the defendants, CAPRICE FOSTER and MARCUS AARON FOSTER, and others known and unknown to the Grand Jury, did knowingly and with intent to defraud, use one and more unauthorized access devices, to wit, credit cards issued by financial institutions, during a one-year period, to wit, from April 1, 2019 to April 1, 2020, and by such conduct did obtain things of value aggregating to $1,000 and more during that period, to wit, lines of credit associated with numerous credit cards, including, but not limited to, a JP Morgan Chase Sapphire credit card ending in 0947, said use affecting interstate and foreign commerce, in that the use involved purchasing goods from businesses engaged in commerce.

(In violation of Title 18, United States Code, Section 1029(a)(2) and (c)(l)(A)(i) and 2).

## COUNTS 9-11

(Aggravated Identity Theft)

THE GRAND JURY FURTHER CHARGES THAT:

102.    On or about the dates identified below, in the Eastern District of Virginia and elsewhere, the defendants, CAPRICE FOSTER and MARCUS AARON FOSTER, did knowingly transfer, possess, and use the means of identification of other persons without lawful authority and during and in relation to a felony enumerated in 18 U.S.C. § 1028(A)(c), as identified below, and knowing that the means of identification belonged to another actual person:

| Count | Date | Felony | Victim | Means of Identification Used |
|-------|------|--------|--------|------------------------------|
| 9 | April 15, 2020 | Count 3 | J.T. | Name, Social Security Number |
| 10 | August 22, 2018 | Counts 4 & 5 | G.M. | Name, Social Security Number, Date of Birth |
| 11 | September 10, 2019 | Count 7 | R.D. | Name, Social Security Number |

(In violation of Title 18, United States Code, Sections 1028A(a)(1) and 2).

24

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT THE PROPERTY DESCRIBED BELOW IS SUBJECT TO FORFEITURE:

Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendants CAPRICE FOSTER and MARCUS AARON FOSTER are hereby notified that, if convicted of the offenses alleged in Counts 1 and 4 through 7 of the Superseding Indictment, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendants CAPRICE FOSTER and MARCUS AARON FOSTER are hereby notified that, if convicted of the offenses alleged in Counts 1 through 3 of the Superseding Indictment, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property, constituting, or derived from, proceeds obtained directly or indirectly, as the result of the violation.

Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendants CAPRICE FOSTER and MARCUS AARON FOSTER are hereby notified that, if convicted of the offense alleged in Count 8 of the Superseding Indictment, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. §§ 982(a)(2)(B) and 1029(c)(1)(C): any property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of such violation; and any personal property used or intended to be used to commit the offense.

The assets subject to forfeiture include, but are not limited to, the following:

a. A sum of money equal to at least $273,892 in United States currency, representing the amount of proceeds obtained as a result of the offenses.

Pursuant to 21 U.S.C. § 853(p), defendants CAPRICE FOSTER and MARCUS AARON FOSTER shall forfeit substitute property, if, by any act or omission of, defendants CAPRICE FOSTER and MARCUS AARON FOSTER, the property referenced above cannot be

25

located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third

party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in

value; or has been commingled with other property which cannot be divided without difficulty.

> (In accordance with Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), 982(a)(2)(B), and 1029(c)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

A TRUE BILL

**Pursuant to the E-Government Act, The original of this page has been filed under seal in the Clerk's Office**

_____

FOREPERSON

Raj Parekh
Acting United States Attorney

By: _____

Heidi Boutros Gesch
Carina A. Cuellar
Assistant United States Attorneys

26