IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:20-cr-178 (TSE) |
| | ) | |
| CAPRICE FOSTER | ) | Sentencing: March 18, 2022 |
| | ) | |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES ON SENTENCING

Caprice Foster, and her husband and co-defendant, Marcus Foster perpetrated a far-reaching fraud and identity theft scheme that allowed them to live in luxury homes and drive a high-end vehicle at the expense of the many victims who suffered from their actions. As a real estate agent, Caprice Foster ("Caprice") was entrusted with her client's personal identifying information ("PII"), but instead of protecting her clients' PII, she stole it, and she and Marcus Foster ("Marcus") used it with abandon for their own benefit.[1] The couple obtained countless bank accounts, credit cards, and loans using their victims' identities, and they moved into at least five residences using other people's PII and failed to pay rent. The Fosters used the victims' PII until a victim's credit was so decimated that his/her PII was no longer useful to them. Throughout their scheme, the Fosters showed a complete and utter disregard for the harm they were causing their victims. The Fosters stopped at nothing to effectuate or prolong their fraud—from falsely claiming to have been hospitalized with stage 3 breast cancer to claiming that a parent died from COVID to Marcus falsely posing as other people during court proceedings—

---

[1] The government will be referring to the defendants by their first names throughout this memorandum in order to clearly distinguish between the co-defendants in this case, who are married and share the same last name.

1

not once, but twice. For these and other reasons discussed below, the United States respectfully submits that a sentence within the advisory guidelines range is necessary to satisfy the aims of sentencing set forth in 18 U.S.C. § 3553.

## I. GUIDELINES RANGE

### A. Guidelines Calculation

With the exception of the leadership role enhancement the government is seeking, the government and the U.S. Probation Office ("USPO") are in agreement regarding the calculation of the defendant's offense level under the U.S. Sentencing Guidelines ("U.S.S.G."). The government and USPO agree that (1) the defendant's base offense level is a level 7 pursuant to "U.S.S.G." §§ 2X1.1(a) and 2B1.1(a)(1); (2) because the loss amount was more than $550,000 but less than $1.5 million, the defendant's base offense level is increased by 14 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(H); (3) the offense involved 10 or more victims, resulting in a two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i); (4) the offense involved sophisticated means and the defendant intentionally engaged in such conduct, resulting in a two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(10)(C); (5) the offense involved the unauthorized transfer and use of a means of identification to unlawfully produce other means of identification and the possession of 5 or more means of identification that unlawfully were produced from another means of identification, increasing the offense level by 2 pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) and (ii); and (6) the defendant abused a position of private trust in a manner that significantly facilitated the commission of the offense, increasing the offense level by 2 levels pursuant to U.S.S.G. § 3B1.1(c). For the reasons discussed below, the government also believes a 2-level increase for a being a leader or organizer of a criminal activity is appropriate, pursuant to U.S.S.G. § 3B1.1(c).

Because the defendant assisted the government in the investigation and prosecution of the defendant's own misconduct by timely notifying the United States of her intention to plead guilty, the defendant qualifies for a 2-level reduction pursuant to U.S.S.G. § 3E1.1(a), and the government believes an additional 1-level reduction is appropriate under U.S.S.G. § 3E1.1(b).[2] Accordingly, the government contends that the appropriate the total offense level under the Sentencing Guidelines, which are advisory, is a 28.  With a Criminal History Category of IV, this offense level yields a Guidelines range of 110 to 137 months.

The contested enhancements are addressed below.

**B.  The Defendant Used Sophisticated Means to Commit the Fraud**

The U.S.P.O. correctly assessed a 2-level enhancement pursuant to § 2B1.1(b)(10)(C) because the defendant intentionally engaged in conduct constituting sophisticated means in order to carry out the fraud scheme. The defendant objects to this enhancement.

When considering whether a defendant used sophisticated means, "[a] sentencing court should consider the cumulative impact of the criminal conduct, for the 'total scheme' may be 'sophisticated in the way all the steps were linked together.'" *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012)) (citations omitted).  The Fosters' fraud scheme was a years-long calculated scheme that, when viewed as a whole, clearly went beyond a "straightforward identity theft."

To execute the scheme, the Fosters stole others' PII, predominantly through Caprice's position in real estate and time share sales, which gave her access to client's identifying

---

[2] Consistent with the plea agreement, the government is recommending the third point for acceptance of responsibility. The government would nevertheless note that it was a close call to recommend additional 1-level reduction in this instance, as the government had done significant trial preparation at the time of the defendant's guilty plea, including preparing more than 20 witnesses to testify at trial.

3

information.  The Fosters also stole people's real identification documents (e.g. passport, social security card, driver's license) and used those to create fake identification documents in the names of their identity theft victims.  They used the fake passports, social security cards, and driver's licenses they created to falsely verify their identities in applications for bank accounts, credit cards, loans, and leases.  Caprice identified several vacant properties with high list prices and a lengthy period of time on the market, and the Fosters used mailboxes at those addresses to receive financial mail connected with their fraud, including check books, debit cards, and credit cards.  The Fosters also stole mail from targeted wealthy neighborhoods and attempted to deposit checks they stole into accounts they opened using other people's identities.  Not only did the Fosters negotiate stolen checks, but they also created fraudulent checks that they attempted to deposit into the fraudulent bank accounts they opened.

In addition to the false identification documents and checks they created, the Fosters created fictitious earnings statements and tax documents in the names of their identity theft victims to qualify for loans, lines of credit, and leases.  They incorporated a company, identified as Company B in the Statement of Facts, that they used in furtherance of the fraud.  Among other things, the Fosters sometimes listed Company B as an employer in their fabricated documents, allowing them to falsely verify employment and income information in an attempt to obtain approval of loan, credit card, and lease applications they submitted using other people's identities.

In order to execute their fraudulent scheme, and at times to prevent its detection, the Fosters impersonated their identity theft victims in emails, text messages, phone calls, and even in person.  They created emails addresses and obtained Voice over Internet Protocol phone numbers for many of the people whose identities they stole and used those email accounts and

phone numbers to pose as the identity theft victims in communications with financial institutions, lenders, landlords, and realtors. At times, they concocted elaborate stories designed to manipulate and elicit sympathy from landlords and realtors.

In addition, Caprice and Marcus both posed as identity theft victims in in-person interactions with realtors, and falsely identified themselves (using name and PII) to law enforcement after they moved into a vacant residence without permission or lawful authority. Marcus even impersonated multiple identity theft victims at in-person landlord-tenant court proceedings. Viewed in its totality, the evidence shows that the defendants intricately planned and executed a sophisticated scheme involving multiple levels of fraud that "separates the offense . . . from the ordinary or generic." *See U.S. v. Jinwright*, 683 F.3d at 486.

### C. The Defendant Organized and Managed the Criminal Activity and Minimized Her Role During Her Plea Hearing

The government contends that Caprice had a leadership role in the Fosters' fraudulent scheme that warrants 2-level enhancement under U.S.S. G. § 3B1.1(c). When considering whether to apply an enhancement under U.S.S.G. § 3B1.1(c), the Court should consider the following factors: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *See* U.S.S.G. § 3B1.1, cmt. n. 4. Contrary to Caprice's claims during her plea hearing in this case, the evidence developed in the government's investigation shows that Caprice was responsible for planning and directing the fraud scheme. She exercised decision-making authority throughout the scheme, and she exercised control and authority over Marcus. She also recruited an accomplice to participate in the scheme.

Caprice painted a very different picture for the Court at her plea hearing.  During her plea colloquy, Caprice indicated that the fraud scheme was orchestrated and led by her husband and co-defendant, Marcus, and that she had minimal knowledge and a minimal role.  The defendant claimed that she simply provided PII for Marcus to open bank accounts and verified his employment and address for loan and credit card applications.  *See* Exh. 1 (Caprice Foster Plea Hrg. Tr. Excerpts) at 36-37.  She claimed not to know the details and denied knowing where the checks that Marcus deposited into fraudulent accounts came from.  *Id.*  She also told the Court that at the beginning of the scheme, she "didn't know anything" and that she "never got any money."  *Id.* at 37-38.  As detailed below, the evidence tells a different story.

Communications between Caprice and Marcus show that Caprice directed much of Marcus's activity in furtherance of the fraud, including directing him to apply for bank accounts, credit cards, loans, and leases using PII she stole; instructing him to steal mail; telling him to impersonate identity theft victims in phone calls and meetings with realtors and in communications with financial institutions and landlords; and directing him to make fraudulent documents including checks and pay stubs.[3]  Throughout the fraudulent scheme, Caprice's involvement in the fraudulent activity was largely "behind-the-scenes," while she directed Marcus to do most of the public activities that presented the greatest risk of getting caught (*e.g.* in-person bank transactions, ATM deposits, impersonating others at in-person court appearances and in meetings with realtors, stealing mail).  In so doing, Caprice minimized her own risk of

---

[3] In the Fourth Circuit, marital communications relating to a crime in which both spouses are participants are not protected by the martial privilege.  *See United States v. Broome*, 732 F.2d 353, 365 (4th Cir. 1984) ("[W]here marital communications have to do with the commission of a crime in which both spouses are participants, the conversation does not fall within the marital privilege."); *United States v. Ledingham*, 340 F. App'x 150, 153 (4th Cir. 2009) ("Because Ledingham and his wife jointly were involved during their marriage in ongoing criminal activity . . . he cannot rely on the marital communications privilege.") (citation omitted).

getting caught and paved the way for her to blame Marcus and claim, as she did at her plea hearing, that her knowledge of the fraud and her role were limited. For the reasons described here and in more detail below, the Government contends that a 2-level enhancement under U.S.S.G. § 3B1.1(c) is warranted.

The instances of Caprice directing fraudulent activity are too voluminous to fully recount here, so this memorandum will highlight some representative examples. On numerous occasions, Caprice directed Marcus to submit specific fraudulent applications using other people's PII and gave him specific direction on how to do so in order to minimize the risk of getting caught.[4] For instance, on July 8, 2018, near the beginning of the charged scheme, Caprice texted Marcus a link to an application for a USAA rewards visa.[5] *See* Exh. 2. Marcus responded to Caprice's text, providing an online user ID, password, and PIN number for G.M. *Id.* The next day, Caprice and Marcus had the following text exchange:

    CAPRICE:    "Get this doc ASAP back to USAA before noon."

    MARCUS:    "Yes I knk"

    CAPRICE:    "Oh I don't know how your gonna call and show the number you gave them but block the number ok."

    MARCUS:    "Yes I kno usaa remembers numbers."

    CAPRICE:    "Yes so pls don't forget"

---

[4] Unless otherwise noted, the messages exchanged between Caprice and Marcus that are discussed herein were on Caprice's iPhone, which was seized by law enforcement on July 8, 2020, pursuant to a judicially-authorized search warrant.

[5] The same day, an application was submitted in G.M.'s name for a USAA Visa. *See* ECF No. 119 (Caprice Foster Statement of Facts), ¶ 19.

*See* Exh. 3.  In another instance, Caprice sent Marcus an application to one of the email accounts they created in the name of identity theft victim, N.N.[6], and instructed Marcus to "open it up and type on it don't fill it out with you handwriting." *See* Exh. 4.

Caprice also directed Marcus to conduct transactions involving the fraudulent bank accounts they opened.  For instance, on May 14, 2020, Caprice instructed Marcus to withdraw money from a Bank of America account and deposit it into a fraudulent account opened in one of the identity theft victim's names.  Caprice wrote to Marcus, "You need to go to boa and get money out to deposit in chase . . . Do you have the chase debit card for [D.D.T.]?[7] *See* Exh. 5. A few days later, on May 20, 2020, Marcus texted Caprice, "How much I'm putting in chase," and Caprice responded "100." *Id.*

Caprice also instructed Marcus on several occasions to make fraudulent documents.  For instance, on August 22, 2018, Caprice and Marcus exchanged the following texts:

> CAPRICE:  "I need you to call Usaa Make sure they got the information and come make the pay stubs."
>
> MARCUS:  "Yes ok"
>
> CAPRICE:  "I'm applying for a place come on."

*See* Exh. 6.  That day, the Fosters submitted a fraudulent residential lease application in G.M.'s name to a luxury apartment complex and provided fictitious paystubs as proof of employment and income.[8]  On another occasion, Caprice texted Marcus, "We need updated paystub for

---

[6] This message referred to the identity theft victim by first name only.
[7] This message referred to the identity theft victim by first name only.
[8] The lease application the Fosters submitted in G.M.'s name was approved, and the Fosters moved into the luxury building and failed to pay rent.  When they were being evicted in April 2019, the Fosters sent an email posing as G.M. in which they falsely claimed that G.M. was in the ICU after having a mastectomy and asked to be allowed additional time to vacate the apartment.

[D.C.T.] . . . ."[9]  *See* Exh. 7.  In another series of texts on May 27, 2020, Caprice scolded Marcus when a fraudulent check he made was drawn on a closed account. Caprice wrote:

> "Marcus the d*mn check you made that I put in citi bank"
>
> "The f*ckin account is closed"
>
> "Citi bank just sent me a email saying that"
>
> "F*ck are you not listening to me"
>
> "If you f*ckin pay attention to what we're doing you'll understand wtf I'm saying"

*See* Exh. 8.  Marcus responded, "I just deny ur I told u from the beginning I was closed I don't even kno why I made it  u a time waster rookie." *Id*.  These texts show that Caprice was running the show, and Marcus was following her direction.

There are also numerous text messages showing that Caprice was telling Marcus which identity theft victim's PII to use for various fraudulent activities.  For example, on June 4, 2020, Marcus texted Caprice, "I'm working" along with a photograph showing part of a cashier's check and a computer screen with identity theft victim information and "$25,000.00" typed in different font sizes.  Caprice responded, saying "U don't have information."  The below text messages followed:

> MARCUS:   "I'm doing the checks I doing the accounts wtf"
>
> MARCUS:   U*
>
> CAPRICE:   So wh
>
>   Don't do D.D.T.[10]
>
> CAPRICE:   Do D.C.T.[11]

---

[9] This message referred to the identity theft victim by first name only.
[10] This message referred to the identity theft victim by first name only.
[11] This message referred to the identity theft victim by first name only.

| | | |
|---|---|---|
| MARCUS: | Y u said do everybody | |
| CAPRICE: | Cut that music down | |
| CAPRICE: | What's wrong with you | |
| MARCUS: | So who am I doing | |
| CAPRICE: | Stop yelling at me u didn't do shit this week | |
| CAPRICE: | You made a check last week | |

*See* Exh. 9.  Again, these message show Caprice exercising supervisory and decision-making authority in the planning and execution of the fraud scheme.

The text messages between the Fosters also show several instances in which Caprice instructed Marcus to steal mail or to pick up their fraudulent financial mail, including check books, from the "mail drop" addresses they used for their fraud.  Some illustrative texts between Caprice and Marcus are provided in the below table.  Byrd and Ballantrae refer to addresses where the Fosters received mail for their fraudulent accounts.

| 9/10/2018 | CAPRICE: | "You need to go to the mailbox on Byrd" |
|---|---|---|
| 5/11/2020 | CAPRICE: | "My checks were delivered to Ballantrae"<br>"At front door."<br>"Hello" |
| | MARCUS: | "Got em" |
| 5/13/2020 | CAPRICE: | "Don't be sitting in there drive way I hope your sitting across at the other Ballantrae" . . .<br><br>"Wait for the mail to come before you leave." |
| 6/1/2020 | CAPRICE : | "Go straight to the mailbox" |
| 6/3/2020 | MARCUS: | "I think they stopped the mail" |
| | CAPRICE: | "Omg."<br>"Why is other mail there" |

10

|  | MARCUS: | "Yes" |
|---|---|---|
|  |  | "In most of the boxes" |
|  | CAPRICE: | "Okay take that sh*t" |

See Exh. 10.

When the Fosters stole the identity of their landlord, J.T., and used it to apply for leases on other properties as they were being evicted from J.T's property, Caprice was directing Marcus's interactions with their realtor, Kris, every step of the way.

| 5/21/2020 | CAPRICE: | "Don't forget to call Kris your [J.T.]"[12] |
|---|---|---|
| 5/23/2020 | CAPRICE: | "Babe call kris let her know your looking for your check book and you need the address to tty Sotheby's" |
|  |  | "Please just let her hear your voice" |
|  |  | "Read what she said before u call" |
|  | MARCUS: | "I called and left a voicemail" |
|  | CAPRICE: | "Ok" |
|  |  | "Tell her u took your girls to the beach you'll give her the checks when you get back" |
| 5/25/2020 | CAPRICE: | "Did u call her [Kris] back tell her you can meet her this evening your not in the area right now like 7:00" |
|  |  | "You just saw her email" |
| 5/29/2020 | CAPRICE: | "Send a message to kris letting her know you did the transfer online last night the bank stated 4-5 business days depending on the receivers bank" |
|  | MARCUS: | "K" |
| 6/5/2020 | CAPRICE: | "Now make sure u talk to kris." |

---

[12] This text message referred to the landlord and identity theft victim by first name.

11

|  | MARCUS: | "Ok all she said was she hope my mom is ok"[13] |
|---|---|---|
|  | CAPRICE: | "Ok so f*ckin say something" |
|  |  | "I told you what to say" |
|  | MARCUS: | "I told her" |
| 6/12/2020 | CAPRICE: | "Let her [Kris] know it's your Sisters check" |
|  | MARCUS: | "K" |
|  | CAPRICE: | "Or girlfriend it's up to u" |

*See* Exh. 11. At other times, Caprice drafted emails or text messages for Marcus to send to landlords or realtors in furtherance of their fraud.

Caprice also recruited an accomplice to participate in the fraud. For example, Caprice's text messages show that she contacted someone on May 23, 2020, and had the following conversation:

> CAPRICE:        "Hey do you have any of your Wells Fargo checks:"
>
> "I got a plan"
>
> ACCOMPLICE:    "checks ?"
>
> "no"
>
> CAPRICE:        "Ok go on line and order your checks ok get them overnighted"
>
> "I got a plan how we can us them"

*See* Exh. 12. Although this accomplice has not been charged, other communications with this individual indicate that he/she participated in the Fosters' fraud scheme.[14]

---

[13] Marcus had told Kris that his mother was hospitalized in the Intensive Care Unit.
[14] For example, communications between Caprice and this accomplice on Caprice's iPhone show Caprice providing this individual with bank account information for identity theft victim D.D.T., and the accomplice asking Caprice how he/she will get his/her cut; Caprice instructing this

Throughout the scheme, Caprice planned, supervised, and directed the fraudulent activity and exercised significant control and authority over Marcus, often giving him detailed directions (which Marcus followed) on how to execute the fraud. She also recruited an accomplice to participate in the scheme. Accordingly, the Government contends that a 2-level enhancement for Caprice's leadership role is supported by the evidence and should be applied in this case.

## II. FACTORS UNDER 18 U.S.C. § 3553(a)

When fashioning a sentence, the Court must not only calculate and consider the total offense level under the Sentencing Guidelines, but it must also consider other factors when deciding what sentence is appropriate. Those factors include the nature of the offense, the characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, afford deterrence, protect the public, and provide the defendant with needed educational or other training. 18 U.S.C. § 3553(a). The Court need not weigh the factors equally but must consider each of them. *United States v. Fowler,* 948 F.3d 663, 674 (4th Cir. 2020). In this case, the nature of the crime, the characteristics of the defendant, and the need to protect the public from further crimes by the defendant counsel strongly in favor of a sentence within the advisory guidelines range.

### A. The Defendant's Fraud was Greed-Motivated, Brazen, and Manipulative, and the Defendant Showed Utter Disregard for Harm She Caused Victims.

Although the Defendant told this Court she did not receive any money from the fraud scheme, she clearly benefited tremendously from the scheme. She lived in the residences procured through fraud and used the Land Rover Ranger Rover vehicle they fraudulently purchased for over $60,000. The residences the couple fraudulently leased or sought to lease

---

individual to go to Bank of America and withdraw funds to deposit in Wells Fargo; and Caprice instructing this individual to get someone else's social security number.

13

were not small or modest homes. Rather, the couple sought out expensive, high-end residences, becoming greedier as the time went on. Initially, in approximately August 2018, the Fosters used G.M.'s identity to rent a unit in a luxury apartment building with a monthly rent of $3,285. By June of 2020, they had an agreement to lease a 6-bedroom, 7,000 square foot home with a monthly rent of $10,000 in J.T.'s name.[15] Kris was the realtor helping Marcus (who Kris knew as J.T.) procure the lease on the $10,000 per month home, and it is clear from Caprice's repeated and insistent directives to Marcus concerning communications with Kris that Caprice was intent on securing the lease on this property. *See* Exh. 11. While it is difficult to tell from account statements whether Marcus or Caprice was spending the fraudulently obtained funds, expenditures at nail salons, eyelash salons, and Sally's Beauty Supply suggest that Caprice was using fraudulent funds for her own benefit.[16]

The Fosters' fraud scheme was also brazen and manipulative. The Fosters stole any identity they could get their hands on and typically submitted dozens of fraudulent applications for each one. Not only did they use the victims' PII in written applications, but they also impersonated the victims on the phone and in person in order to effectuate their fraud. For example, Caprice and Marcus impersonated N.N. and E.G. respectively in their efforts to obtain a lease for a residence on Serenity Woods. While attempting to secure the lease, the Fosters impersonated these two identity theft victims in emails, phone calls, and in-person meetings with the realtors for the property. Ultimately, the Fosters were unable to get their payments to clear, and they were notified that they could not take possession of the property, as the lease was never

---

[15] Ultimately, the Fosters were unable to move into this home because the fraudulent payments they provided did not clear.
[16] Caprice's text messages show that Caprice got her nails done regularly and shopped at Sally's Beauty Supply. There are also references in Caprice's text messages to getting her lashes done.

solidified due to non-payment. Nevertheless, the Fosters somehow gained entry to the home and moved in. When the realtors discovered someone living at the property, they called the police, and Caprice and Marcus falsely identified themselves to police as N.N. and E.G. and provided the police with personal identifiers for N.N. and E.G to verify their identities.

The Fosters were also extremely manipulative in their dealings with landlords and realtors, often telling sob stories in order to effectuate or prolong their fraud. For instance, in dealings with the property manager for the luxury unit the Fosters rented in G.M.'s name, the Fosters, communicating as G.M., claimed that G.M. had been battling stage 3 breast cancer and was worried sick about dying and orphaning her daughters. *See* Exh. 13. When G.M. was being evicted from the property due to non-payment, the Fosters (again communicating as G.M.) claimed that G.M. was in the ICU after having a mastectomy and needed additional time to vacate the apartment. *See* Exh. 14. On another occasion, when the Fosters were using J.T.'s identity to obtain a lease on the $10,000 per month rental, the Fosters (communicating as J.T.) claimed that J.T. was unable to get the realtor the payment owed because J.T.'s mother had died from COVID-19 that day. *See* Exh. 15. The Fosters invented elaborate stories to elicit sympathy from others and used that sympathy to buy themselves more time or to get special treatment in order to effectuate their fraud.

Throughout the scheme, the Fosters showed a complete and utter disregard for their victims. They looked for every opportunity to steal others' PII and used the stolen identification information to the maximum extent for their own benefit. For example, by impersonating E.G. and using his personal identifying information, they were able to rent a residence from J.T. They never paid J.T. any money in rent, and they were able to avoid being evicted for an extended period due the pandemic-related state moratorium on eviction. While they were living in J.T.'s

15

property and failing to pay rent, they went through J.T.'s mail and obtained documents containing J.T.'s PII. They then used J.T.'s PII to obtain fraudulent accounts and apply for numerous rental properties in his name. The Fosters' fraudulent scheme caused real harm to their identity theft victims, who had worked hard to earn a living and build their credit, and yet Caprice wrote a letter to this Court stating that she is "not or never has been a danger to anyone." *See* ECF No. 42 at 5.

### B.   The Defendant Has a Long History of Fraudulent and Deceitful Conduct and Has Threatened Another with Violence while Detained in this Case.

The Court has access to the Pre-Sentence Report for the defendant, ECF No. 138, which details the defendant's extensive history of theft, fraud, and deceit; the government will not repeat it here. However, it bears mentioning that the defendants in this case engaged in mortgage fraud in or around 2014 in which Marcus made false material representations about his employment and income and submitted fraudulent tax documents and secured at $636,446 mortgage on a home that was titled to both Caprice and Marcus. The Fosters defaulted on the mortgage, and the home went into foreclosure. Caprice and Marcus proceeded to file for bankruptcy five times in 2015 and 2016 in order to hinder and delay the foreclosure. Details of the Fosters' mortgage and bankruptcy fraud are provided in excerpts of filings in the United States Bankruptcy Court for the District of Maryland, Case No. 16-23334-WIL, attached hereto as Exhibit 16.

Additionally, on July 2, 2021, while held at Alexandria Detention Center in this case, Caprice asked a third-party to do a three-way call to R.W, a 75-year-old female. R.W. did not answer the call, and Caprice left a voicemail for R.W. in which she threatened R.W., stating, "I'm telling you right now, when I do get out of this sh*t, 'cause I am, I will come and f*ck your

old a** up . . . ." R.W. has been very scared since receiving Caprice's message, which she understood as a threat to physically harm, or even kill, R.W.  *See* Exh. 17 (audio file).

### C. A Lengthy Period of Incarceration is Necessary to Protect the Public from Further Crimes by the Defendant.

It appears from the defendant's criminal history, as described in the PSR, that she has consistently been engaged in fraudulent activity since at least 2001, and likely before. Over the past two decades, the scope and severity of the defendant's conduct has escalated. For the most part, the defendant has not been punished for her conduct. And when the defendant was sentenced to an 18-month period of incarceration for fraud in 2003, she returned to committing fraud soon after her release from custody, resulting in a revocation of her supervised release. *See* ECF No. 138, ¶ 96.

In the instant case, the Fosters were arrested by local authorities in October 2019, during which police discovered a large quantity of stolen mail and fraudulent documents in the Fosters' possession. The Fosters were undeterred by their arrest, continuing with the same fraudulent scheme upon being released. By the time federal authorities arrested them on July 8, 2020, the Fosters had stolen and used additional identities to commit fraud, moved into a property they leased using someone else's PII, stolen the identity of their landlord (to whom they were not paying rent), and purchased a luxury vehicle using someone else's identity. A lengthy period of incarceration is necessary to keep this defendant from victimizing more people, as she has done relentlessly for years.

Indeed, it appears that Caprice believed the gains she could obtain through fraud outweighed the risk of punishment if she were caught. This cost-benefit analysis apparent from Caprice's text message to Marcus on May 26, 2020, stating that "[e]ven Martha stewart has 600

million went to prison for two years." *See* Exh. 18.  Only a lengthy period of incarceration stands a chance of keeping Caprice from rolling the dice again upon release.

### III. FORFEITURE AND RESTITUTION

Forfeiture and Restitution are both mandatory in this case.  The Government will prepare preliminary forfeiture and restitution orders and will ask the Court to enter those orders as part of its judgment at sentencing.

### IV. CONCLUSION

For the foregoing reasons, the government respectfully submits that a sentence within the advisory guidelines range is necessary to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:     /s/
Heidi Boutros Gesch
Carina A. Cuellar
Assistant United States Attorneys

## **CERTIFCATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney of record for the defendant.

                                               /s/
                                         Heidi Boutros Gesch
                                         Assistant United States Attorney